STATE of Missouri, Respondent,

v.

Allen B. BERWALD, Appellant.

No. WD 64445.

Missouri Court of Appeals,
Western District.

Dec. 27, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 31, 2006.

Application for Transfer Denied
April 11, 2006.

Jeremy S. Weis, Kansas City, MO, for appellant.

Shaun J. Mackelprang, Assistant Attorney General, Jefferson City, MO, for respondent.

Before RONALD R. HOLLIGER, Presiding Judge, ROBERT G. ULRICH, Judge and JOSEPH M. ELLIS, Judge.

JOSEPH M. ELLIS, Judge.

Appellant, Allen B. Berwald, was convicted by a Bates County jury of one count of statutory rape in the first degree and one count of statutory sodomy in the second degree, both of which concerned N.B., his adopted minor daughter. Mr. Berwald was sentenced to concurrent terms of imprisonment in the custody of the Missouri Department of Corrections of twenty-five years and seven years, respectively. We reverse his convictions and remand for a new trial.

Before stating the facts of this case, it is helpful to review its relevant procedural history. On October 20, 2003, Mr. Berwald was charged by information with three counts of statutory rape in the first degree (section 566.032);[1] one count of statutory rape in the second degree (section 566.034); two counts of statutory sodomy in the first degree (section 566.062); two counts of statutory sodomy in the second degree (section 566.064); and three counts of endangering the welfare of a child in the first degree (section 568.045). He entered pleas of not guilty to all eleven charges.

Pursuant to Rule 23.04, Mr. Berwald subsequently moved for an order directing the State to file a bill of particulars, which was granted after a hearing. On June 29, 2004 (the morning of the first day of trial), the State filed an amended information dismissing both counts of first-degree statutory sodomy, leaving nine charges intact. These nine charges were as follows.

In Count I, the State alleged that in the summer or fall of 2000, when N.B. was less than fourteen years old, Mr. Berwald committed the crime of statutory rape in the first degree by having sexual intercourse with N.B. in front of the television in the living room of the Berwald family home.

Count II alleged that Mr. Berwald committed statutory rape in the first degree by having sexual intercourse with N.B., who was then less than fourteen years old, by the fireplace in the living room of the Berwald family home in winter 2000 or spring 2001, while Count III alleged that Mr. Berwald committed statutory rape in the first degree by having sexual intercourse with N.B., who was then less than fourteen years old, on her bed in the Berwald family home in summer 2001. In Count IV, the State alleged that in winter 2002, when N.B. was less than seventeen years old, Mr. Berwald committed statutory rape in the second degree by having sexual intercourse with N.B. on her bed in the Berwald family home. In Count V, the State alleged that sometime in winter 2002, when N.B. was less than seventeen years old, Mr. Berwald committed statutory sodomy in the second degree by having deviate sexual intercourse with N.B. in the Berwald family home, during which he inserted his fingers into N.B.'s vagina. Count VI was similar to Count V, and alleged that sometime in 2003, Mr. Berwald committed statutory sodomy in the second degree by having deviate sexual intercourse with N.B., who was then less than seventeen years old, in the Berwald family home, during which he inserted his fingers into N.B.'s vagina. Finally, in Counts VII, VIII, and IX, the State alleged that in summer 2001, winter 2002, and sometime in 2003, respectively, when N.B. was less than seventeen years old and he was her parent, Mr. Berwald committed endangerment of the welfare of a child in the first degree by having deviate sexual intercourse with N.B. in the Berwald family home, during which he inserted his fingers into N.B.'s vagina.

The State's case-in-chief was presented over the course of a day and a half. At

---

1. All statutory references are to RSMo 2000.

the conclusion of the State's case, Mr. Berwald filed a Motion for Judgment of Acquittal at the Close of the State's Evidence. The trial court entered a directed verdict of acquittal on one of the second-degree statutory sodomy counts against Mr. Berwald (Count V), but denied his motion as to the other eight counts. Mr. Berwald's case-in-chief also required a day and a half to present. At the close of all the evidence, Mr. Berwald filed a Motion for Judgment of Acquittal at the Close of all the Evidence. The trial court entered a directed verdict of acquittal on two of the three counts of endangering the welfare of a child in the first degree (Counts VII and VIII), but denied his motion as to the remaining six counts, which were submitted to the jury.[2] The jury found Mr. Berwald guilty on Counts III and VI, but found him not guilty on Counts I, II, IV, and IX. His motion for new trial was overruled, and he was sentenced to concurrent terms of imprisonment in the custody of the Missouri Department of Adult Institutions of twenty-five years on Count III and seven years on Count VI. This appeal followed.

Set forth in the light most favorable to the State, the State's evidence showed the following as to Counts III and VI. N.B., who was born on November 24, 1987, was a sixteen-year-old junior at Butler High School at the time of trial. She is the natural child of Kelly Berwald, who married Mr. Berwald in 1991. In 1992, Mr. Berwald, who was sixty-seven years old at the time of trial, adopted N.B. and her brother M.B. The Berwald family resided in a home located in rural Bates County, Missouri.

In the summer of 2001, N.B. was thirteen years old. Mr. Berwald came into her room one night while she was lying on her bed. He pulled N.B. over to the edge of the bed, so that she was lying across the bed with her legs hanging over the edge. He pulled off her jeans, stood between her legs, and used his hands to open the "folds" around her vagina. Mr. Berwald then rubbed his flaccid penis on N.B.'s vagina and attempted to insert his penis into her vagina, penetrating it slightly. On one occasion in 2003, prior to the end of March, while N.B. was less than seventeen years old and he was her parent, Mr. Berwald inserted his finger into N.B.'s vagina while they were in the Berwald family home. N.B. and only N.B. was the source of all this testimony.

On March 21, 2003, Mr. and Ms. Berwald separated, and Ms. Berwald moved out of the family home to live in the offices of Mr. Berwald's business. N.B. continued living in the Berwald family home for a week or two, and then went to stay with her mother. On or about April 29, 2003, N.B., who feared that her mother was going to get back together with Mr. Berwald, told Ms. Berwald for the first time about being sexually abused by Mr. Berwald, and further revealed, for the first time as well, that she was also involved in a sexual relationship with a boyfriend, B.I. Shortly after hearing these allegations, which were consistent with a "dream sequence" she had experienced a few months earlier during which she dreamed that Mr. Berwald was sexually abusing N.B. while N.B. was asleep, Ms. Berwald used a microcassette tape recorder she had found in the office to audiotape N.B.'s initial account of the abuse. Ms. Berwald then

---

2. Because Counts VI and IX charged essentially the same underlying conduct, the trial court required the State to submit Count IX in the alternative to Count VI. Therefore, Mr. Berwald could have been convicted on either none or one of those two counts, but not both of them.

took N.B. to the circuit clerk's office to obtain a child protection order. A hotline call was placed to the Division of Family Services, and N.B. was subsequently interviewed by various law enforcement, juvenile justice, and family services personnel about the abuse prior to Mr. Berwald's eventual arrest.

The rest of the State's evidence against Mr. Berwald (in fact, the vast majority of the evidence against him) did not relate directly to the criminal acts with which he had been charged. Instead, it pertained to other instances of alleged sexual contact between Mr. Berwald and either N.B. or other persons at various other times, all of which were uncharged offenses. That evidence, all of which was admitted over Mr. Berwald's objections in a motion in limine and during trial as it was introduced, was as follows.

N.B. testified that when she was ten or eleven years old and in the fifth grade, Mr. Berwald told her that her legs were "sexy" when she "would stand on [her] tippy toes." N.B. also testified that a few years later, while she was in the seventh and eighth grades, Mr. Berwald began touching her breasts and/or rubbing her vagina with his hand about four to five times a week. She testified that, when he would rub her breasts, he would rub them just above the nipple and tell her that he was doing that to make them grow faster and mature more quickly.

N.B. further testified about one time during her seventh-grade year, when Mr. Berwald placed her hand in his pants and had her touch his penis and masturbate him. N.B. also testified that, at least on one occasion in the summer following her eighth-grade year, Mr. Berwald had her lie on a counter and spread her legs, then used his hands to open her vagina so that he could examine it, claiming to be checking to see if she was still a virgin, if she

was pregnant, and if tampons were hurting her. She said that, during her ninth-grade year, he would also hide in her closet and watch her getting dressed. According to N.B., these acts continued through her ninth-grade year, and Mr. Berwald would often come into her room at night to molest her. Finally, N.B. testified that during 2002 and 2003, while she was in ninth grade, Mr. Berwald did not have any sexual contact with her involving his penis, but did touch her breasts and rub her vagina with his hand between two and four times a week. When Mr. Berwald touched her during this time, N.B. testified, he would tell her that he was "working her hormones."

The State also presented testimony from Jane Howe and Vicki Twedt, two of Mr. Berwald's adult children from his first marriage. Ms. Howe was forty-five years old at the time of trial and Ms. Twedt was forty-three. Ms. Howe testified that, during the nine-year period when she was six to fifteen years old, Mr. Berwald touched her vagina thirty or more times. According to Howe, he would have her get on the bed with her panties off, lie on her stomach, and raise her buttocks in the air with her legs spread apart. Ms. Howe testified that he would insert his fingers "[j]ust inside the lips" of her vagina "a little bit" and would look into her vagina, claiming he was doing that to check for hernias, to see if she was pregnant, or to see if she had begun having sex yet. Ms. Twedt testified that she was scared of Mr. Berwald and that on numerous occasions between the fifth and eleventh grades, he rubbed her breasts, telling her that if she rubbed the muscle above her breasts, they would get larger. On two occasions, said Ms. Twedt, Mr. Berwald told her to get in the bathtub so that he could check her for a hernia, and when she did so, he opened her vagina with his fingers and looked

inside it. The events described by Ms. Howe and Ms. Twedt had allegedly occurred from twenty to thirty years prior to the charged offenses, and their testimony was admitted over specific and continuing objections by counsel for Mr. Berwald both before trial (in a motion in limine) and during trial that it was inadmissible under *State v. Bernard*, 849 S.W.2d 10 (Mo. banc 1993), and its progeny.

The State also presented the testimony of four witnesses regarding various incriminating statements they purportedly heard Mr. Berwald make in their presence. Ralph Manuel, who had once worked for Mr. Berwald's trucking company as a driver before being fired by him in August 2001, testified that Mr. Berwald told Manuel on one occasion that Berwald had "felt [N.B.'s] breasts for knots." Manuel further testified that Mr. Berwald was always "giddish" [sic] about N.B., not like a proud parent, but like a teenage kid who was "satiated" with her.

Kim Abney, Ms. Berwald's sister, testified that Mr. Berwald called her on April 30, 2003, to tell her that N.B. and Ms. Berwald had accused him of molesting N.B., and that the only thing he could think of that might have led to their accusations was that he "used to rub her buttocks to help her develop more fully." When she asked him what that meant, Mr. Berwald told Abney that "it loosens the muscles, tendons and ligaments, and it makes their—them develop more fully into a woman as he had done with his own children."

Bates County Chief Deputy Sheriff Gary Martin testified that, after criminal charges had been filed against Mr. Berwald, he went to Berwald's home and spoke with him about the accusations. According to Martin, during the course of their hour-long conversation, Berwald denied the allegations but told Martin that once, while he and N.B. were lying on the floor watching television together, he was rubbing a cramp on N.B.'s leg and his hand had gone too far up her leg, prompting her to say, "Dad, that's not my leg."

The State also presented the testimony of Roger Farrell, Ms. Berwald's former stepfather. Farrell testified that, on one occasion in July 2003 when they were talking together at Farrell's business, Mr. Berwald told Farrell that N.B. would "wake up when she wanted me to stop." According to Farrell, Mr. Berwald did not offer any additional details regarding the meaning of that statement, and Farrell conceded on cross-examination that it was possible that Mr. Berwald was merely repeating some of the allegations that had been made against him.

Since there was a conviction, we normally would not present a detailed summary of the evidence presented by the defendant. However, we do so here because, as will soon be seen *infra*, it is important in establishing whether Mr. Berwald suffered sufficient prejudice to be entitled to reversal and remand for a new trial. *See State v. Driscoll*, 55 S.W.3d 350, 357–58 (Mo. banc 2001) (conducting detailed review of defendant's evidence to assist in determining whether the jury would likely have convicted the defendant absent the inadmissible evidence adduced by the State).

Mr. Berwald presented a vigorous defense, during which he and fourteen other witnesses testified in support of his theory of the case, which was that the charged acts of sexual abuse never actually occurred (in whole or in part), but had been fabricated by N.B. and her mother. Mr. Berwald adamantly denied all of the charged (and uncharged) allegations of sexual abuse that had been leveled against him and insisted that he had never touched N.B. in an inappropriate way. He presented numerous witnesses to support

his defense theory, including: (1) expert medical evidence to show that due to his various health problems (including, as acknowledged at trial by N.B. herself) impotence, congestive heart disease, and knee replacement surgery, he was physically incapable of performing some of the sexual acts alleged by N.B. and was out of the home in the hospital during part of the charged time frames; (2) evidence that N.B. was involved in a forbidden sexual relationship with her boyfriend B.I. and was motivated to fabricate the abuse charges "so that her mom wouldn't be so mad at her" for having sex with B.I. and to be able to keep seeing him; (3) evidence that he was often on the road or working late as a truck driver and was not home often enough for him to have molested N.B. nearly as often as she claimed he did; (4) evidence that Ms. Berwald was motivated to fabricate the allegations against him to gain leverage in her pending divorce action against him and to draw attention from the fact that she and several of the State's witnesses against him had been involved in stealing or concealing several thousand dollars in company funds from his business after they separated (including Mr. Manuel and Ms. Abney, who admitted their complicity in Ms. Berwald's scheme at trial); and (5) evidence that Ms. Berwald had started to plant the idea of the molestation in people's minds well before leaving him for another employee of his business, John Freed, with whom she had had an affair during the marriage.

Mr. Berwald also presented substantial impeachment evidence, including: (1) testimony from a female friend of N.B.'s who said N.B. had told her that Mr. Berwald never molested her; (2) testimony from N.B.'s brother to the effect that he never observed anything that would corroborate N.B.'s testimony, never saw Mr. Berwald and N.B. alone and never saw him in her bedroom, that N.B.'s story kept changing when he communicated with her about the allegations, and that he felt pressured by a State Technical Assistance Team (STAT) investigator, Larry Wyrick, to "help his sister out" by confirming her allegations; (3) testimony that N.B. kept in close contact with Mr. Berwald after leaving the family home to live with her mother and attended a birthday dinner for Mr. Berwald at the Berwald family home on April 9, 2003; (4) testimony that Ms. Howe told a detective that she was concerned the information from N.B. about the claimed molestations was fabricated; (5) testimony that there were often various overnight guests at the family home, making N.B.'s allegations as to the pervasive scope and extent of the alleged sexual abuse unlikely to be true; (6) testimony from Ms. Berwald that on one occasion before N.B. first told her she had been sexually abused by Mr. Berwald, when Ms. Berwald had asked N.B. if Mr. Berwald had sexually abused her, N.B. said "no"; (7) testimony from DFS investigator Rhonda Talley that, during N.B.'s initial interview with Talley, N.B. told Talley that Mr. Berwald had never put his penis into her vagina; (8) a stipulation that the SAFE exam performed on N.B. at Children's Mercy Hospital revealed no physical signs of sexual abuse; and (9) testimony from several different witnesses to attempt to impeach or discredit the accounts of Ms. Howe and Ms. Twedt.

As noted *supra,* at the close of the evidence, instructions, and arguments of counsel, Mr. Berwald was found guilty of one count of first-degree statutory rape and one count of second-degree statutory sodomy, and not guilty of the two remaining counts of first-degree statutory rape, one count of second-degree statutory sodomy, and one count of endangering the welfare of a child. Jury sentencing having been waived by Mr. Berwald, on August 6,

2004, the trial court, after overruling his motion for new trial, sentenced Mr. Berwald to concurrent terms of twenty-five years' imprisonment for first-degree statutory rape and seven years' imprisonment for second-degree statutory sodomy in the custody of the Department of Corrections. This appeal followed. Any additional facts necessary to the disposition of the appeal will be supplied as needed later in this opinion.

In his first point, Mr. Berwald contends that the trial court prejudicially erred and abused its discretion in admitting the trial testimony of Jane Howe and Vicki Twedt regarding uncharged acts of sexual abuse he purportedly committed against them as children some twenty to thirty years before trial because it was neither logically nor legally relevant to the issues before the jury in that their testimony did not relate to any criminal offense for which he was on trial and its prejudicial effect far outweighed its probative value.

■ "A trial court typically has broad discretion in deciding whether to admit evidence and, as such, its decision will not be disturbed unless a clear abuse of discretion is shown." *State v. Danikas*, 11 S.W.3d 782, 788 (Mo.App. W.D.1999). It has long been established, though, that "a defendant has the right to be tried only for the offense for which he is on trial, and that evidence of other crimes committed by [the] defendant is normally inadmissible." *State v. Edwards*, 116 S.W.3d 511, 533 (Mo. banc 2003). Such uncharged crimes evidence carries with it several significant risks, including:

(1) that the introduction of evidence of other crimes will mislead or confuse the jury, (2) that the jury will give undue weight to the "if he did it once, he'll do it again" inference, (3) that the defendant will be made to defend, not just against the charges brought, but against all of

his prior, similar behavior which, for whatever reason, was not prosecuted by the State, and (4) that the jury, in its rush to punish the defendant for his past acts—which the jury must infer have gone unpunished—may overlook the fact that the State has failed to prove the defendant was guilty of the charges brought.

*State v. Bernard*, 849 S.W.2d 10, 22 (Mo. banc 1993) (Robertson, C.J., concurring in part).

■ "If, however, evidence of prior misconduct is both logically and legally relevant to prove the charged crime, it is admissible." *State v. Barriner*, 34 S.W.3d 139, 144 (Mo. banc 2000). "Evidence is logically relevant if it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial." *Id.* In this regard, "[e]vidence of prior uncharged misconduct generally has a legitimate tendency to prove the specific crime charged when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan, or the identity of the person charged with the commission of the crime on trial." *Id.* at 145.

■ With regard to identity as a basis for logical relevance, in *State v. Bernard*, 849 S.W.2d 10 (Mo. banc 1993), the Missouri Supreme Court expressly recognized a closely-related exception for certain prior uncharged misconduct that falls within the "signature *modus operandi*/corroboration" category. *Id.* at 17. "The signature *modus operandi*/corroboration exception approximates the long established, well recognized exception that allows evidence of prior uncharged misconduct for the purpose of proving the identity of the wrongdoer." *Id.* "In the context of corroboration, evidence of prior crimes is logically relevant [if] it has a legitimate tendency to

prove a material fact in the case by corroborating the testimony of the victim as to the sexual assault." *Id.* Nevertheless:

For the prior conduct to fall within the identity exception, there must be more than mere similarity between the crime charged and the uncharged crime. The charged and uncharged crimes must be nearly identical and their methodology so unusual and distinctive that they resemble a signature of the defendant's involvement in both crimes.

*Id.* (internal quotation marks omitted); *see also State v. Frey,* 897 S.W.2d 25, 31 (Mo. App. W.D.1995) (holding that the uncharged crime must be "so unusual and distinctive as to be a 'signature' (similar to a fingerprint) of the defendant's conduct.") "This is a threshold requirement that must be met before the trial court can proceed to weigh any additional factors in determining the question of admissibility." *Bernard,* 849 S.W.2d at 17.

■ Of course, to be admissible, evidence must also be legally relevant. *Id.* Evidence is legally relevant if its probative value outweighs its costs. *State v. Barriner,* 111 S.W.3d 396, 401 (Mo. banc 2003). This determination "involves a process through which the probative value of the evidence (its usefulness) is weighed against the dangers of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time or needless presentation of cumulative evidence (the cost of the evidence)." *State v. Sladek,* 835 S.W.2d 308, 314 (Mo. banc 1992).

Since *Bernard* was decided, the appellate courts of this state have been quite reluctant to sanction the admission of evidence relating to a defendant's prior uncharged misconduct under the signature *modus operandi*/corroboration exception to the general rule of exclusion. As our Supreme Court observed in *State v. Gilyard,* 979 S.W.2d 138, 141 (Mo. banc·1998),

"[b]ecause of the stringent standard for legal relevance, however, most cases addressing the corroboration exception have held the evidence of prior uncharged misconduct inadmissible." In particular, "the passage of time between incidents [may be] so lengthy that the prejudice or other 'cost' of the evidence outweighs the probative value of the signature *modus operandi.*" *Bernard,* 849 S.W.2d at 19. Indeed, this court has held that "[b]ecause evidence of other crimes is highly prejudicial, such evidence should be admitted only when there is 'strict necessity.'" *State v. Pennington,* 24 S.W.3d 185, 190 (Mo.App. W.D.2000).

In admitting the trial testimony of Jane Howe and Vicki Twedt, the trial court found it to be both logically and legally relevant. As to logical relevance, the trial court ruled that because the allegations they planned to make if allowed to testify were "so similar to what occurred, or what [N.B.] has said," their testimony "goes to motive, to intent, to absence of mistake or accident, and to a, potentially, a common scheme or plan." As to legal relevance, the trial court ruled, without any further explanation: "Of course, this is prejudicial. I believe its probative value outweighs its prejudicial effect."

■ The State does not even attempt to defend the trial court's ruling on the logical relevance of the testimony of Ms. Howe and Ms. Twedt on the grounds that it was probative as to motive, intent, the absence of mistake or accident, or a common scheme or plan. Instead, the State argues solely that the evidence was logically relevant to identify Mr. Berwald as the person who committed the charged crimes under the signature *modus operandi*/corroboration exception recognized in *Bernard.*

While formally recognizing the signature *modus operandi*/corroboration excep-

tion in Missouri, the Court in *Bernard* cautioned against the indiscriminate admission of such evidence at trial, noting that it was " 'particularly important that the requirement for a signature *modus operandi* be strictly enforced' " to ensure that the exception does not " 'become so broad that it swallows up the underlying rule of exclusion.' " *Bernard,* 849 S.W.2d at 16, 17 (quoting *Sladek,* 835 S.W.2d at 315 (Thomas, J., concurring)). Thus, the Court required that any evidence of prior uncharged sexual misconduct that corroborates the testimony of the victim "be nearly identical to the charged crime and so unusual and distinctive as to be a signature of the defendant's *modus operandi.*" *Id.* at 17.

Although both are threshold requirements "that must be met before the trial court can proceed to weigh any additional factors in determining the question of admissibility," *id.,* such as assessing whether the evidence's probative value exceeds its costs, including "the dangers of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time or needless presentation of cumulative evidence," *Sladek,* 835 S.W.2d at 314, the factual summary provided *supra* makes it clear that, with regard to the trial testimony of Ms. Howe and Ms. Twedt, the State did not make the first of these two essential showings—namely, that the charged and uncharged crimes were "nearly identical."

Mr. Berwald went to trial accused of nine separate criminal offenses alleged to have been committed against N.B. between the fall of 2001 and the spring of 2003. Counts I–IV were all statutory rape charges involving allegations of sexual intercourse between Mr. Berwald and N.B., including actual penetration of her vagina by Mr. Berwald's penis. However, neither Ms. Howe nor Ms. Twedt alleged that Mr.

Berwald ever had sexual intercourse of any kind with them, with or without successful penetration. And while Counts V–IX all charged that Mr. Berwald had deviate sexual intercourse with N.B. during which he inserted his fingers into N.B.'s vagina, the record shows that the testimony of Ms. Howe and Ms. Twedt clearly did not involve uncharged sexual misconduct which was "nearly identical" to one or more of those charged crimes, as both women described digital-vaginal contact during which Mr. Berwald spread the lips of their vaginas and peered inside, either to check for hernias, to see if they were pregnant, or to see if they had begun having sex yet. In stark contrast, N.B.'s trial testimony pertaining to the crimes charged in Counts V–IX described overtly sexual digital-vaginal contact which *did not* involve any such distinctive conduct by Mr. Berwald. Finally, Ms. Twedt's testimony that Mr. Berwald rubbed her breasts, telling her that if she rubbed the muscle above her breasts, they would get larger, also had no relationship whatsoever to any of the criminal conduct alleged in Counts I–IX, in that none of the counts contained allegations that Mr. Berwald rubbed N.B.'s breasts.

The State nevertheless insists that the trial testimony of Ms. Howe and Ms. Twedt was logically relevant since it had a legitimate tendency to prove a material fact in the case by corroborating the testimony of N.B. as to the sexual abuse Mr. Berwald had inflicted on her. Pointing to N.B.'s trial testimony that, during the summer after she completed the eighth grade, Mr. Berwald had her lie on a counter and spread her legs, then used his hands to open her vagina so that he could examine it (claiming to be checking to see if she was still a virgin, if she was pregnant, and if tampons were hurting her), and that Mr. Berwald would "work her hormones" by rubbing her breasts just

above the nipple to make them grow faster and mature more quickly, the State argues that Mr. Berwald's practice of allegedly conducting bogus do-it-yourself medical examinations in order to overcome his daughters' concerns about inappropriate sexual contact was "so unusual and distinctive as to be a signature of the defendant's *modus operandi.*" *Bernard,* 849 S.W.2d at 17.

 Had the trial testimony of N.B. cited by the State concerned a *charged offense* against Mr. Berwald, we might consider entertaining the State's argument. However, it did not. Rather, it concerned *uncharged* criminal acts alleged by N.B. which were supposedly "corroborated" by the testimony of Ms. Howe and Ms. Twedt regarding events which allegedly occurred some two or three decades before. Since the narrow signature *modus operandi* /corroboration exception to the general rule of inadmissibility recognized in *Bernard* requires that "[t]he similarity must be between the prior uncharged act *and the present crime,*" *Frey,* 897 S.W.2d at 31 (emphasis added); *see also Bernard,* 849 S.W.2d at 17 (emphasis added) (noting that "[f]or corroboration evidence to be of sufficiently increased probative value so as to outweigh its prejudicial effect, the evidence must be more than merely similar in nature *to the sexual assault for which the defendant is charged.*"), the trial testimony of Ms. Howe and Ms. Twedt was logically irrelevant in that it did not corroborate the testimony of N.B. as to any of the criminal offenses for which Mr. Berwald was on trial. Accordingly, that testimony was inadmissible and the trial court erred and abused its discretion in admitting it over repeated objections by Mr. Berwald.[3] We now proceed to the question of prejudice. "With regard to trial court errors that have been preserved, we review for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Hutchison,* 957 S.W.2d 757, 761 (Mo. banc 1997). This rule is generally applicable when we review issues pertaining to the admission of evidence. *See, e.g., State v. Churchill,* 98 S.W.3d 536, 538 (Mo. banc 2003) (internal quotation marks omitted) ("When this Court is asked to review the admissibility of evidence, it reviews for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial."); *State v. Anderson,* 76 S.W.3d 275, 277 (Mo. banc 2002) (same). In particular, our Supreme Court has held that it is to be applied in cases where, as here, a criminal defendant alleges on direct appeal that a trial court erred in admitting evidence of prior uncharged crimes over timely and specific objection that "the offenses were not logically relevant nor necessary to prove the charged crimes." *State v. Morrow,* 968 S.W.2d 100, 105, 106 (Mo. banc 1998).[4]

---

**3.** Since evidence must be both logically and legally relevant to be admissible, we need not decide the issue of its legal relevance. We note, however, that the events described by Ms. Howe and Ms. Twedt had allegedly occurred from twenty to thirty years prior to the charged offenses and that several hundred pages of the transcript were devoted either to their testimony or the related testimony of Mr. Berwald's opposing witnesses. During all this, the jury no doubt focused its attention more on the stale sexual abuse allegations of Mr. Berwald's adult daughters than on the allegations of N.B. herself, thereby setting the stage for possible confusion of the issues, misleading the jury, undue delay, and waste of time.

**4.** "In most cases of trial court error, the issue is whether the evidence was 'outcome determinative,' that is, whether 'the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for

■ In criminal cases involving the improper admission of evidence, the test for prejudice "is whether the improper admission was outcome-determinative." *State v. Black*, 50 S.W.3d 778, 786 (Mo. banc 2001).

> When the prejudice from the improper admission of evidence is outcome-determinative, reversal is required. A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence.

*Id.* (internal citation omitted); *see also State v. Bell*, 950 S.W.2d 482, 484 (Mo. banc 1997); *Case*, 140 S.W.3d at 87. In judicially determining whether "there is no reasonable probability that the jury would have acquitted but for the erroneously admitted evidence," *Black*, 50 S.W.3d at 786, we must keep in mind that the State is "not entitled to the benefit of all reasonable inferences from the evidence, as in a

review for the sufficiency of the evidence." *Driscoll*, 55 S.W.3d at 357.

■ In *Bernard*, the Court held that the prior uncharged crimes evidence which did not meet the narrow signature *modus operandi*/corroboration exception to the general rule of inadmissibility because it bore "no similarity to the conduct with which [the defendant] is charged in the present case ... is prejudicial, and its admission requires reversal and remand for a new trial." 849 S.W.2d at 20. Moreover, "[t]he amount of evidence that was erroneously admitted and the extent to which the evidence was referred during the trial" may also be considered in determining the existence of reversible, outcome-determinative error. *Barriner*, 34 S.W.3d at 151.

■ In this regard, the record shows that the evidence in question (considered together with that which Mr. Berwald was forced to present in an attempt to rebut the allegations of Ms. Howe and Ms. Twedt) was extensive, covering well over 200 printed pages of the transcript. The transcript also demonstrates that the pros-

---

the erroneously admitted evidence.'" *Driscoll*, 55 S.W.3d at 356 (quoting *Barriner*, 34 S.W.3d at 150). However, when a properly preserved error is so serious that it rises to the magnitude of a federal or state constitutional violation, including "due process, confrontation clause, right to present a defense, right to access justice through the courts of Missouri, right to a reliable verdict and sentencing, [or] cruel and unusual punishment," *State v. Wolfe*, 13 S.W.3d 248, 263 (Mo. banc 2000), it is *presumed* to be prejudicial and "the judgment of guilt can be affirmed only if it is shown [by the State] that the error was harmless beyond a reasonable doubt" in accordance with the "heightened standard" of review set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). *Driscoll*, 55 S.W.3d at 356; *State v. Case*, 140 S.W.3d 80, 87 (Mo.App. W.D.2004) (noting that when

the error complained of rises to the level of a constitutional violation, "[t]he State must prove beyond a reasonable doubt that [it] did not contribute to the verdict obtained.") *See also State v. Whitfield*, 107 S.W.3d 253, 262 (Mo. banc 2003) (internal quotation marks omitted) ("Under this test, the beneficiary of a constitutional error, the State, must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.") Although there is some older Missouri authority to the contrary, as demonstrated by *Morrow*, in which our Supreme Court employed the general test for prejudice when the defendant alleged trial court error in the admission of evidence of prior uncharged crimes over his timely and specific objection at trial, this case does not involve a federal or state constitutional violation, so the harmless-beyond-a-reasonable-doubt standard of *Chapman* and *Neder* does not apply here.

ecutor took full advantage of the trial court's erroneous rulings permitting the State to present the testimony of Ms. Howe and Ms. Twedt over proper objection by Mr. Berwald. The prosecutor actually *began* his closing argument to the jury by specifically referring to that evidence, and also repeatedly mentioned it throughout his rebuttal argument, claiming that Ms. Howe and Ms. Twedt were especially credible witnesses since, unlike some of the other witnesses the jury had heard testify, "[t]heir stories are consistent" and "[t]hey never had their stories rehearsed." The prosecutor also contended that what happened to N.B. was "a re-creation of what happened" to Ms. Howe and Ms. Twedt, even though that was clearly not the case as to any of the crimes with which Mr. Berwald was charged and for which he was on trial. The transcript further shows that the prosecutor's last words to the jury before it retired to begin its deliberations were: "And Jane [Twedt] and Vicki Howe came into this courtroom and testified that they still loved him [Mr. Berwald]. They still loved him. They still love him. Man, if you ever saw raw emotion and a family in hurt and turmoil, this is it. There's something going on here." Thus, the State's belated claim on appeal that this evidence did not contribute to the jury's guilty verdicts on Counts III and VI in any way is totally inconsistent with what it argued to the jury at trial. "Because of the volume of testimony devoted to the improperly admitted evidence, as well as the number of references highlighting the improperly admitted evidence, the likelihood that this evidence had a lasting impact on the jury is great." *Id.*

Nevertheless, the State maintains that there was no outcome-determinative prejudice. First, the State argues that Mr. Berwald was not prejudiced since the jury was given a limiting instruction, which stated:

> If you find and believe from the evidence that the defendant was involved in offenses other than the one [sic] for which he is now on trial and other than the offenses mentioned in Instructions Nos. 9, 11, 13, 15, 17, and 19[5] you may consider that evidence on the issues of motive, intent and absence of mistake or accident. You may not consider such evidence for any other purpose.

■ This argument is disingenuous, because as noted *supra*, the State does not even attempt to justify the admission of the testimony of Ms. Howe and Ms. Twedt on the grounds that it was probative as to Mr. Berwald's motive, intent, or the absence of mistake or accident. Furthermore, even if it had any such evidentiary value, it would still have been inadmissible because where, as here, "evidence of other crimes is unnecessary because motive, intent, ... or absence of mistake were not issues, the probative value of such evidence is far outweighed by its prejudicial effect." *State v. Conley,* 938 S.W.2d 614, 621 (Mo.App. E.D.1997). Since the challenged testimony was inadmissible for any purpose, the limiting instruction was wholly ineffective to protect Mr. Berwald's right to be tried only for the offenses with which he had been charged and for which he was on trial.

Second, the State claims Mr. Berwald was not prejudiced because, if the testimony of Ms. Howe and Ms. Twedt had played a decisive role in its deliberations, "the jury would likely have convicted [him] on all possible counts." As illustrated by the cases cited *supra*, that is not the appropri-

---

**5.** These instructions were the verdict directors on Counts I, II, III, IV, VI, and IX, respectively.

ate inquiry to determine the existence of outcome-determinative prejudice. Instead, the appropriate inquiry is whether there is a substantial likelihood that the jury would have acquitted Mr. Berwald on five or all six charges (rather than on only four) had the trial court properly excluded the highly prejudicial testimony of Ms. Howe and Ms. Twedt, which undoubtedly (but impermissibly) bolstered the rest of the State's case against Mr. Berwald. Given the overall weakness of the State's case against Mr. Berwald and the large amount of defense evidence he presented tending to show his innocence,[6] this is not a particularly close call. We therefore reject the State's speculative claim that the erroneously admitted evidence played little or no role in producing the jury's guilty verdicts on Counts III and VI due to his acquittal by the jury on Counts I, II, IV, and XI.

To summarize, after thoroughly reviewing the record and the law, we can only conclude that the trial court erred and abused its discretion in admitting the evidence in question. Moreover, Mr. Berwald has demonstrated to our satisfaction that when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted Mr. Berwald on Counts III and VI but for the error committed by the trial court in admitting the testimony of Ms. Howe and Ms. Twedt. Accordingly, the point is granted, and Mr. Berwald's convictions on Counts III and VI must be reversed and the case remanded for a new trial.

In his second point, Mr. Berwald argues that the trial court prejudicially erred and abused its discretion in admitting the trial testimony of N.B. herself regarding multi-ple uncharged acts of sexual abuse he purportedly committed against her because it was neither logically nor legally relevant to the issues before the jury in that her testimony as to those acts did not relate to any criminal offense for which he was on trial and its prejudicial effect far outweighed its probative value.

Since Mr. Berwald has been granted a new trial on Counts III and VI and it is unclear whether and how such other crimes evidence from N.B. will be introduced in a retrial not involving Counts I, II, IV, V, VII, VIII, and IX, we need not decide the point in this appeal. The same applies to Mr. Berwald's fourth point, in which he argues that, due to the trial court's erroneous admission of N.B.'s vague and overlapping trial testimony concerning a host of similar charged and uncharged criminal sexual acts which she said took place at or around the time of the events charged in Count VI, the jury was unable to reasonably distinguish between the charged and uncharged acts and he was effectively denied his constitutional right to a unanimous verdict of guilt by all twelve jurors on Count VI. Should either or both of these issues arise on retrial, in deciding whether to admit or exclude N.B.'s uncharged crimes testimony (in whole or in part), the trial court is to be guided by the applicable portions of our analysis *supra,* as well as the proper exercise of its sound discretion.

In his third and final point, Mr. Berwald argues the trial court abused its discretion in denying his motion to dismiss all charges against him or to grant him a new trial based on the State's failure to preserve a microcassette audiotape of N.B.'s initial allegations which had been

---

**6.** The State dropped two of the original eleven charges against Mr. Berwald immediately prior to trial and he was acquitted on seven of the nine remaining charges, either by the trial court or the jury.

recorded by Ms. Berwald. We disagree, because, although the State's handling of this evidence was sloppy and perhaps negligent, Mr. Berwald has not shown that the audiotape in question was exculpatory or that the State acted in bad faith in failing to preserve it.

To properly understand this contention, it is necessary to set forth some additional facts. As mentioned *supra,* Ms. Berwald created the audiotape in question on or about April 29, 2003, when N.B. told Ms. Berwald for the first time about being sexually abused by Mr. Berwald. On March 15, 2004, Mr. Berwald took the deposition of his estranged wife. While testifying regarding the initial allegations lodged by her daughter, Ms. Berwald let slip the fact that she had audiotaped her conversation with N.B.

The record shows that, although Mr. Berwald was not, the State was well aware of the existence of the tape before Ms. Berwald's deposition, because, as conceded by the State in its brief, it had been delivered by her to five different state investigators involved in the criminal investigation a few days after she recorded it, including DFS investigator Rhonda Talley, Bates County Chief Deputy Juvenile Officer Deborah Powell, STAT investigator Larry Wyrick, and two members of the Bates County Sheriff's Department (Justin Moreland and Gary Martin), none of whom preserved or attempted to electronically enhance the tape before giving it back to Ms. Berwald.

Mr. Berwald subsequently filed a motion to dismiss the amended information in its entirety, seeking to establish a violation of *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), based on his claim that the State failed to preserve potentially exculpatory evidence. In particular, Mr. Berwald alleged that the State had acted in bad faith by (1) failing to preserve the tape; and (2) failing to attempt to have the audio electronically enhanced to determine if it contained any exculpatory evidence before returning it to Ms. Berwald, "a woman who is actively engaged in divorce proceedings from Mr. Berwald and has an interest in seeing him sentenced to prison." The motion further alleged that Mr. Berwald had retained an audio expert who believed that "the tape could, in all likelihood, have been enhanced to obtain the complete statements" from N.B. and Ms. Berwald.

During a brief hearing on the motion a few days before the start of trial, the prosecutor stated that Ms. Berwald had advised him she could not find the tape and that she may have discarded it. The prosecutor also stated that Talley and Powell both explained to him that they gave the tape back to Ms. Berwald because it "is of no use to us, or you can't hear it, or some words to the effect that this isn't any good," explaining: "That may be negligence, but I don't see that as bad faith. And it's just like police not taking fingerprints at the scene of a crime. I mean, you know, if they—if they are sloppy and don't do it, I think it's more akin to that than it is a discovery violation." The trial court postponed ruling on the motion, waiting to see if the tape would be found before trial began, but made a preliminary finding of no bad faith on the State's part. Immediately before swearing the jury, the trial court overruled Mr. Berwald's motion to dismiss.

At trial, seven witnesses testified about the tape. N.B. testified that when she had listened to it, "you couldn't hardly understand very much." Ms. Berwald testified that she made the tape, which she subsequently "got rid of" or misplaced, so N.B. wouldn't have to repeat her allegations against Mr. Berwald, but that the various

law enforcement officials she took it to "couldn't understand it."

Powell, for whom Ms. Berwald evidently played the tape first, testified that the first three minutes of the tape were "inaudible," stating that she could not hear anyone's voices and that there was "absolutely not one word that I could understand on the tape." She further stated that all she heard on the tape was "scratching and banging" and that the tape was "completely useless as any kind of tool." However, Powell acknowledged that she'd never fast-forwarded the tape to check to see if the quality improved later on. Talley also heard the first few minutes of the tape, describing it as "inaudible," stating that the voices were "muddled" and "muffled." Like Powell, Talley acknowledged that she never attempted to fast-forward through the tape to see if other portions were audible.

Detective Justin Moreland of the Bates County Sheriff's Department testified that he was given the tape by Ms. Berwald, but that he "couldn't understand anything on it," because all he could hear was "mumbling." He testified that he made no report about the tape because it had no apparent evidentiary value and was of no benefit to either party. Deputy Martin testified that he hardly remembered the tape and did not recall listening to it, but said that Detective Moreland had told him that it was inaudible. Finally, STAT investigator Wyrick testified that he was given the tape by Ms. Berwald and tried to play it, but couldn't understand what was being said because "it wasn't a very good recording." Although he could hear voices, testified Wyrick, they were "staticky" and "garbley" [sic] so he gave the tape back to Ms. Berwald, explaining that because he found the tape to be a "fairly insignificant" piece of evidence, he didn't bother to mention it in his written report.

Asked whether he attempted to fast-forward through the tape to see if other portions were audible, Wyrick stated that he couldn't remember. Wyrick further testified that he did not have the tape analyzed by an audio expert to try to filter out the static and background noise because he relied on the Missouri State Highway Patrol laboratory for such services, which had been unable to successfully filter tapes that were "a lot better than" this tape.

 A trial court's refusal to dismiss a charging instrument is reviewed for abuse of discretion. *See State v. Burns*, 112 S.W.3d 451, 454 (Mo.App. W.D.2003). "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413, 422 (1984). Therefore, in assessing whether a trial court abused its discretion in refusing to impose dismissal as a sanction for the State's failure to preserve evidence that is potentially useful to the defense, this court must determine "whether the evidence was of such significance to create a reasonable likelihood that the outcome of the trial would be affected." *Burns*, 112 S.W.3d at 454–55.

 Moreover, even if the evidence might be expected to play such a role in the outcome of the trial, a defendant must also show that "the State acted in bad faith in destroying the evidence or that the exculpatory value of the evidence was apparent before it was destroyed." *Id.* at 455. "Absent a showing of bad faith on the part of the police or prosecutor, the failure to preserve even potentially useful evidence does not constitute a denial of due process." *State v. Ferguson*, 20 S.W.3d 485, 504 (Mo. banc 2000). In this context, bad

faith is the destruction of the evidence by a state actor "for the purpose of depriving the defendant of exculpatory evidence[.]" *State v. Armentrout,* 8 S.W.3d 99, 110 (Mo. banc 1999). Thus, to merit relief on a claim of failure to preserve evidence, the defendant must also show that the evidence had an exculpatory value that was apparent to the State before it was destroyed. *Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422. Accordingly, for due process purposes, bad faith turns on law enforcement's " 'knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" *State v. Smith,* 157 S.W.3d 687, 691 (Mo.App. W.D.2004) (quoting *Youngblood,* 488 U.S. at 56 n.*, 109 S.Ct. at 336 n.*, 102 L.Ed.2d at 288 n.*).

The trial testimony recited *supra* makes it abundantly clear that Mr. Berwald failed to show that the tape in question contained exculpatory evidence significant enough to create a reasonable likelihood that the outcome of the trial would have been affected. Indeed, in his brief, he articulates no specific basis for doing anything more than speculating that something exculpatory might possibly have been found had the tape been electronically enhanced to filter out the static and background noise. Furthermore, even if the evidence was potentially useful, Mr. Berwald also failed to make a showing that the State acted in bad faith in failing to preserve the evidence since he did not demonstrate that its exculpatory value was apparent to the State before the tape was lost or destroyed or that the tape was not preserved for the purpose of depriving him of access to exculpatory evidence. Point denied.

Mr. Berwald's convictions on Count III (statutory rape in the first degree, section 566.032) and Count VI (statutory sodomy in the second degree, section 566.064) are reversed and the case is remanded for a new trial.

All concur.