### STATE of Missouri, Plaintiff–Respondent,

v.

### Robert E. MADISON, II, Defendant–Appellant.

### No. SD 29325.

Missouri Court of Appeals, Southern District, Division One.

Jan. 27, 2010.

Margaret M. Johnston, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and Jayne T. Woods, Assistant Attorney General, Jefferson City, MO, for Respondent.

DON E. BURRELL, Judge.

Robert Madison ("Defendant") was charged with first-degree assault, second-degree murder, first-degree burglary, and two counts of armed criminal action in connection with a home invasion that resulted in the wounding of Marcus Robinson ("Victim") and the death of Shekiah Robinson ("Victim's wife"). Following a jury trial, Defendant was convicted of one count of first-degree assault pursuant to section 565.050 and one count of armed criminal action pursuant to section 571.015.[1] The jury acquitted Defendant of the second-degree murder charge as well as the first-degree burglary charge and its corresponding armed criminal action count.

Defendant was sentenced as a persistent felony offender and received concurrent eighteen year terms of imprisonment on each conviction. Defendant now appeals those convictions, alleging the trial court abused its discretion by: 1) allowing an arresting officer to testify that Defendant asked him if he was "being arrested for a sales charge[;]" and 2) refusing to allow Defendant to question Victim about a petition for an *ex parte* order of protection his wife had filed against him a year prior to her death. Finding no merit in either of these contentions, we affirm the convictions.

### Facts

Defendant does not contest the sufficiency of the evidence to support his convictions. Viewed in the light most favorable to the verdicts, that evidence was as follows.

Defendant lived about a half-mile away from the mobile home in which Victim and his wife resided ("Victim's house"). Victim testified that he had known Defendant for about ten years and characterized their relationship as follows:

---

1. Unless otherwise indicated, all statutory references are to RSMo 2000.

A. Well, at the time we was 'gettin'[2] along, we was cool, rode around, talked every once in a while, and then it was like I stopped 'talkin' to him. We was 'gettin' along good though. I ain't never seen no problems.

Q. Was this a situation where you would seek out him to be your friend or did he seek out you?

A. He would come to me. I didn't go to him.

A few days before the shooting that resulted in the death of Victim's wife, Nathan Winfield gave Defendant a ride to Victim's house. On the way there, Defendant told Winfield that "everybody got a good side and a bad side." When they arrived at Victim's house, Winfield dropped Defendant off and left quickly. Defendant was wearing camouflage gloves and camouflage pants and a blue latex glove was hanging out of one of his pockets.

Victim saw Defendant and came outside. Victim watched Defendant walk to one end of Victim's house, pause, walk to the other end, then pause again. Defendant then said to Victim, "Man, I got a good side and I got [a] bad side." Defendant told Victim he had something to tell him, but that his "bad side says don't tell" and "the good side says tell." Defendant pointed to the side of Victim's house where Victim had posted a "beware of dog" sign that showed a man with a revolver and had lettering that read, "Don't be aware of the dog, be aware of the owner." Defendant then said, "Don't be aware of God, be aware of the owner."

Defendant finally said, "God sent me over here to kill you all." When Victim asked Defendant to repeat what he had just said, Defendant said, "God sent me over here to kill you all [ ... ] Nah, you know what? You're a good man, I ain't 'gonna' even do with all that." Defendant then told Victim he was going to go get something to eat and walked away.

Victim told a friend, his wife, and law enforcement about the threat Defendant had made. Detective Bobby Sullivan ("Detective Sullivan") told his supervisor about the threat and advised Victim to stay off the streets and avoid Defendant.

On the night of the fatal shooting, Lewis "Kit–Kat" Wiggons, an acquaintance of both Defendant and Victim, testified that he was leaving his house to go to the store when Defendant approached him and asked if he could use Wiggons's cell phone to call Victim. Wiggons gave Defendant his phone but did not overhear Defendant's conversation. Victim, who had caller-ID, answered the phone thinking it was his friend, "Kit–Kat." When Victim realized it was Defendant, he was suspicious because Defendant had never called him "out of the blue" before. After Defendant's call, Victim and his wife began looking for a .40 caliber handgun they had previously hidden somewhere in their house.

Martez Williams testified he was driving around his neighborhood on the night of the shooting. Defendant flagged him down and asked for a ride "across the tracks" toward Victim's house. Williams let Defendant get in, and Defendant placed a chrome-colored gun on the center console of Williams's car. When Williams asked Defendant what he was going to do with the gun, Defendant replied, "I'm about to go kill an ol' boy." When Williams asked Defendant who he intended to kill, Defendant responded, "[Victim]."

**2.** The court reporter who prepared the trial transcript put colloquial or slang terms inside single quotation marks and we include them here as in the original. We will also reproduce the testimony as given without any reference to grammatical errors.

Williams told Defendant to get out of the car because Williams was on probation and could not be around guns. Defendant got out of Williams's vehicle and started walking in the direction of Victim's house.

Victim testified that just before Defendant arrived, Victim and his wife had located and loaded their gun, were seated at their kitchen table, and Victim was showing his wife how to shoot the pistol. Victim's dogs started barking, and Victim and his wife heard a noise at their screen door. Victim's wife went to the door to see what the noise was, and Defendant entered the trailer displaying a chrome-colored revolver. Defendant pointed the revolver at Victim and began firing. Victim, who still had the couple's loaded gun in his hand, returned fire. Victim testified "the whole time I was 'shootin' the gun with one hand. So I felt like if I was 'shootin' it with both hands [Defendant] 'woulda' got hit." Victim fired his gun at least five times, and Defendant fired his gun at least twice.

After the shooting began, Defendant started backing up toward the door, then turned and ran outside. At that point, Victim turned and saw his wife lying on the floor. Victim then had his daughter dial 9-1-1 for him as he looked for his car keys.[3] As a result of the shots fired, Victim had one gunshot wound to his side, and Victim's wife had three gunshot wounds: one to her head, one through her chest, and one to her elbow. Victim's wife died as a result of the gunshot wounds to her chest and head. Defendant was not wounded in the gun battle.

Approximately seven officers responded to the scene, and later the Southeast Missouri Major Case Squad[4] became involved in the investigation. Officer Franklin

Adams ("Officer Adams"), a K-9 handler with the Sikeston Department of Public Safety, was the first officer to arrive. Officer Adams testified that when he arrived, Victim was outside screaming, "My wife has been shot in the head, [Defendant] shot me, shot my wife, and I think I shot him before he left." After checking Victim's wife's body for a pulse and finding none, Officer Adams heard other officers arrive. Officer Adams advised the arriving officers of the situation and took his dog out to try and get a track on Defendant. The dog followed a human track for about 150 yards before losing the scent.

While investigating Victim's house, officers found thirteen grams of crack cocaine beneath Victim's wife's body. The officers also seized Victim's Glock .40 caliber handgun as evidence. Five of the shell casings located at the scene were determined to have been fired from a .40 caliber gun. The other two shell casings were determined to have been fired from a different gun. The bullet in the skull of Victim's wife was determined to have been fired from Victim's gun. Based upon the location of the various bullet holes inside the house, officers concluded that shots had been fired from two different directions.

After receiving a tip that Defendant had returned to the house where he was living with his mother, Officer Adams and other officers went to that location. Officer Adams looked in one of the home's windows and saw Defendant looking directly back at him. Defendant refused to come out of his mother's house, despite the officers' attempts to speak to him, until the officers had cut power to the house, spoken to Defendant through a loudspeaker,

---

3. Victim testified he believed he could rush his wife to the hospital in his own car faster than an ambulance could arrive and transport her.

4. A group consisting of investigators from several county sheriff's departments, city police departments, and the highway patrol, as well as county prosecuting attorneys.

and finally resorted to using tear gas projectiles. After the tear gas had been deployed, Defendant finally stepped outside where Officer Zach Albright ("Officer Albright") arrested him.

As Defendant was being arrested, he asked Officer Albright, "Are you here to arrest me for a sales charge?" When Officer Albright informed Defendant that he was being arrested for a homicide, Defendant "looked at [Officer Albright], giggled, and made no more comment." A subsequent search of the home where Defendant had been residing with his mother unearthed two camouflage gloves and a black jacket with gunshot residue on the cuff and two blue rubber gloves inside the sleeves.

## Analysis

### Standard of Review

"The trial court is vested with broad discretion in ruling questions of relevancy of evidence and, absent a clear showing of abuse of that discretion, the appellate court should not interfere with the trial court's ruling." *State v. Olson*, 854 S.W.2d 14, 16 (Mo.App. W.D.1993). "A trial court's ruling is an abuse of discretion if it is 'clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration[.]'" *Id.* (quoting *State ex rel. Webster v. Lehndorff Geneva, Inc.*, 744 S.W.2d 801, 804 (Mo. banc 1988)). "An abuse of discretion occurs only when no reasonable jurist would concur with the circuit court's ruling." *State v. Henderson*, 105 S.W.3d 491, 495 (Mo.App. W.D.2003). Furthermore, "[e]videntiary decisions of the trial court as to relevance are reviewed, in the context of the whole trial, to ascertain whether the defendant received a fair trial." *State v. Walkup*, 220 S.W.3d 748, 757 (Mo. banc 2007). "Beyond questions of relevance, even where a particular evidentiary ruling is in error, appellate courts review evidentiary errors to ascertain whether they were prejudicial, that is, whether the errors are more likely than not to have affected the outcome." *Id.*

### Point I—Admissibility of Defendant's Question at Time of Arrest

■ Defendant's first point alleges the trial court erred in allowing Officer Albright to testify that Defendant asked if he was being arrested "for a sales charge," arguing the testimony was more prejudicial than probative (legal relevance) because it constituted evidence of a crime with which he had not been charged.

■ "A criminal defendant has a right to be tried only for the offense for which he is charged." *State v. Johnson*, 201 S.W.3d 551, 555 (Mo.App. S.D.2006). Therefore, "[e]vidence of separate and distinct crimes or bad acts are generally not admissible for the purpose of showing that the defendant is a bad person or has a propensity to commit acts of that nature." *State v. Wallace*, 943 S.W.2d 721, 724 (Mo. App. W.D.1997). "This is because such evidence may cause a jury to convict a defendant on the basis of perceived propensities rather than on the basis of substantial and competent evidence." *Henderson*, 105 S.W.3d at 495.

■ "Only when evidence of uncharged misconduct clearly is logically and legally relevant to establishing the defendant's guilt of the crime for which he is on trial is it admissible." *Id.* "Evidence is logically relevant 'if it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial,' and legally relevant 'if its probative value outweighs its prejudicial effect.'" *Id.* (quoting *State v. Barriner*, 34 S.W.3d

139, 144–45 (Mo. banc 2000)). "The balancing of the effect and value of evidence rests within the sound discretion of the trial court." *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993).

When Defendant objected to Officer Albright's being allowed to testify about Defendant's question, the trial court overruled the objection, believing the evidence was more probative than prejudicial. The trial judge based his ruling on the fact that Defendant's presence at the scene was at issue and $1,300 worth of crack cocaine had been located under Victim's wife's body. The State then argued in closing that Defendant's question to Officer Albright corroborated Victim's testimony that Defendant was the person who shot him.

■ As Defendant acknowledges in his brief, Defendant's question "could have been used by the jury in reaching the conclusion that [Defendant] was present at the crime scene." Defendant's asking if he was being arrested for "a sales charge" created an inference that he was present at the crime scene (where $1,300 worth of crack cocaine had been located beneath Victim's wife's body) and possibly revealed a motive for Defendant to begin shooting at Victim. It also suggested that Defendant was thinking about a recent drug deal that might have attracted the notice of police officers. Defendant's question was therefore logically relevant because it constituted circumstantial evidence that Defendant had committed the offenses for which he was being tried, not some other "separate" or "distinct" crime. "The State may paint a complete picture of the crime charged and need not sift and separate evidence." *Johnson*, 201 S.W.3d at 556.

■ Defendant's argument is that even though the testimony was logically relevant, it was not legally relevant because it was not "strictly necessary"—a reference to the Western District's statement that evidence of other crimes "should be admitted only when there is a 'strict necessity.' " *State v. Berwald*, 186 S.W.3d 349, 359 (Mo. App. W.D.2006) (quoting *State v. Pennington*, 24 S.W.3d 185, 190 (Mo.App. W.D. 2000)).

■ Assuming Defendant's question to Officer Albright ("Are you here to arrest me for a sales charge?") constituted evidence of a separate crime, Officer Albright's testimony about it was necessary to refute the principal defense in the case—that Defendant had not been at the crime scene. On one hand, "[a]ny prejudice to Defendant in this case can be attributed to the very probativeness of the challenged evidence." *See Johnson*, 201 S.W.3d at 557. Specifically, any damage Defendant suffered from the testimony about his question would have come from the jury seeing a logical connection between his question and the drugs found beneath Victim's wife's body. A "[d]efendant is not entitled to exclude evidence[ ] merely because it damages his case." *Id.*

On the other hand, while the evidence hurt Defendant by corroborating Victim's testimony that Defendant was the person who shot him, it may also have helped Defendant win his acquittal on the most serious charges brought against him. Defendant's question tended to support the defense theory that even if Defendant had been present, he had nothing to do with the death of Victim's wife. Defendant's question suggested he was unaware that the police were there to arrest him for a homicide. The jury knew the laboratory evidence indicated Victim was the person who had fired the shots that killed his wife. The jury could have acquitted Defendant of the second-degree murder charge and its corresponding armed criminal action count because it believed Defendant's

question to Officer Albright indicated Defendant was unaware that Victim's wife had been killed because Victim killed her after Defendant had withdrawn from the scene.

The fact that the jury acquitted Defendant of three out of the five charges also demonstrates it did not find him guilty simply because he might be a drug dealer or have a propensity to commit crimes. Because Defendant's question to Officer Albright was both logically and legally relevant, the trial court did not err in overruling Defendant's objection. Point I is denied.

### Point II—Victim's Wife's Year–Old Petition for Ex Parte Order of Protection

Defendant's second point alleges the trial court abused its discretion in refusing to allow him to cross-examine Victim about a petition for an *ex parte* order of protection his wife had filed against him a year before she was killed. Defendant argues he should have been allowed to pursue the matter as it would impeach Victim's testimony that his relationship with his wife was a good one. Defendant argues he was entitled to use Victim's wife's petition to show that Victim had a motive to kill his wife "because such a showing was consistent with [Defendant's] theory of defense that [Victim] had shot his wife and was trying to frame [Defendant] [ ... ]." We disagree.

"This court's review of the admission or exclusion of evidence is undertaken on the basis that evidentiary rulings are matters in which the trial court has broad discretion; that those rulings will not be disturbed on appeal absent abuse of discretion." *State v. Bisher*, 255 S.W.3d 29, 33 (Mo.App. S.D.2008). "[I]n matters involving the admission of evidence, we review for prejudice, not mere error, and

will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.*

During the State's direct examination of Victim, the prosecutor asked, "[H]ow would you describe your and [Victim's wife's] relationship up to [the day of the shooting]?" Victim replied, "It was good. We was 'gettin' along, everything was 'goin' perfectly smooth like a relationship should." The following colloquy then took place during defense counsel's cross-examination of Victim:

Q. And yesterday you testified that you and [Victim's wife] had a good relationship?

A. Correct.

Q. Not having problems?

A. No.

Q. Didn't constantly fight?

A. No.

Q. Not physical with her?

A. No.

Q. Or short tempered with her?

A. We, we would have our ups and downs, but, you know, that every, every relationship have ups and downs.

Q. Were there times when you punched her?

[prosecutor]: Objection, Your Honor.

A. No.

[The Court]: That is sustained. The jury will disregard the question.

Q. She didn't want out of the relationship?

A. You said what?

[prosecutor]: Objection, calls for speculation on behalf of her.

[The Court]: Sustained.

Q. She filed a restraining order against you—

[prosecutor]: Objection, Your Honor.

A. You said what?

Q. She—

[The Court]: The objection is sustained.

[defense attorney]: Judge, may we approach?

[The Court]: You may.

Outside the hearing of the jury, defense counsel then argued that questioning Victim about his wife's filing of what he referred to as "the restraining order" constituted proper impeachment of Victim's testimony that he and his wife had a good relationship up to the time of her death. Upon inquiry from the court, defense counsel said that Victim's wife had filed the petition almost exactly one year prior to her death. The trial court then sustained the prosecutor's objection that the matter was too remote in time to be relevant. After the court made its ruling, defense counsel marked the petition and resulting *Ex Parte* Order of Protection as Exhibit A. The trial court preserved Exhibit A for the record as an offer of proof as to its contents but did not receive it into evidence or allow defense counsel to question Victim about it.[5]

In *State v. Riley*, 213 S.W.3d 80 (Mo. App. W.D.2006), the defendant was charged with drug possession. His theory of defense was that the drugs seized belonged not to him, but to his wife. *Id.* at 92–93. In support of that theory, the defendant wanted to question his wife about the fact that she had tested positive for drugs about ten days before his trial began—a date approximately ten months after the seizure of the drugs he was charged with possessing. *Id.* at 92. The defendant argued that his wife's positive drug test was relevant to show continuing drug use that supported an inference that she had been the person exercising control over the drugs seized from their home ten

months earlier. *Id.* at 93. The Western District upheld the trial court's ruling prohibiting that line of inquiry on the grounds that the positive drug test was too remote in time to be relevant. *Id.* In light of the Western District's ruling in *Riley,* we cannot say the trial court in the instant case abused its discretion in ruling that Victim's wife's year-old order of protection petition had any relevance to the status of the couple's relationship one year later.

Even if the trial court had erred in finding the petition too remote in time to be relevant, its ruling may be upheld on any legally sustainable basis. *See State v. Hamilton,* 227 S.W.3d 514, 516 (Mo.App. S.D.2007). To show Victim was motivated to kill his wife because she had filed a petition for order of protection against him, he would have to have known that she had done so. Exhibit A reveals that Victim was never served with a copy of his wife's petition or the court's order. As a result, Exhibit A provided no good faith basis for questioning Victim about the matter. Moreover, as earlier indicated, the jury acquitted Defendant of the second-degree murder charge and its corresponding armed criminal action count. Defendant's second point is also denied, and the judgment of convictions and sentences is affirmed.

BATES, P.J., and BARNEY, J., concur.

---

5. That exhibit has been deposited with this court in accordance with Missouri Court Rule 81.16(a) (2009) and this court's Special Rule 4.