

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD84901 |
| | ) | |
| STEPHEN D. TURNER, | ) | Opinion filed: December 26, 2023 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**THE HONORABLE J. DALE YOUNGS, JUDGE**

Division One: Edward R. Ardini, Jr., Presiding Judge,
Anthony Rex Gabbert, Judge and Thomas N. Chapman, Judge

Stephen Turner appeals the judgment of the Circuit Court of Jackson County convicting him, after a jury trial, of thirty-one felony sexual offenses and sentencing him to life in prison plus 107 years. The victims were his step-daughters K.H. ("Victim 1") and C.T. ("Victim 2"), and Victim 2's friend J.H. ("Victim 3"). On appeal, Turner argues that the trial court abused its discretion both by refusing to dismiss the charges against him or sanction the State for failing to preserve exculpatory evidence and by restricting his closing argument, that there was insufficient evidence to convict him of forcible rape as charged in Count 13, and that there was insufficient evidence to convict him of the class B felony

of use of a child in a sexual performance as charged in Count 28. The State concedes Turner's final point. For the reasons stated below, we reverse Turner's conviction for the class B felony of use of a child in a sexual performance, enter a conviction for the class C felony of use of a child in a sexual performance, and remand to the trial court for resentencing on this conviction. In all other respects, the judgment is affirmed.

**Factual and Procedural Background**

Turner does not challenge the sufficiency of the evidence of the majority of his convictions, thus we do not recount the details of the numerous instances of sexual abuse he inflicted upon the victims in this case. We do, however, describe some of the instances that are relevant to the issues raised on appeal.

Turner lived with and raised Victim 1 and Victim 2 from the time they were four-years-old and two-years-old, respectively. Throughout their childhoods, Turner sexually abused Victim 1 and Victim 2 on a continuous—often daily—basis. Victim 2 could not "ever remember not having to" engage in sex acts with Turner. The abuse included vaginal and anal intercourse, Turner touching their genitals, licking their breasts, and performing oral sex on them, as well as Turner requiring them to touch his genitals, perform oral sex on him, and perform sex acts on each other.

The family—which included Victim 1, Victim 2, their two brothers, their mother ("Mother"), Turner, and Turner's son—lived in various residences in Jackson County. They first lived in a home on Ewing Drive. Mother and her children moved out of that home and in with Mother's parents for a brief period because Mother and Turner "were fighting." Mother and Turner reconciled and the family moved to a residence on Concord

2

Circle.[1] After that, the family moved to a residence on Stayton, which was in Independence, Missouri. Victim 1 was 12 years old when the family moved to the Stayton house. Victim 2 was "in the fifth grade," "roughly 10 to 11 years old."

The sexual abuse "worsened" and become more frequent at the Stayton house. There was a shed in the backyard that "was completely separate from [the] house," and was insulated, soundproofed, and could be used in all seasons. The shed could be locked from the inside, and Turner had placed security cameras outside of the shed so that he knew "if someone were going to be close to entering the shed." "The vast majority of the abuse at Stayton took place in the shed."

When Victim 1 "had just turned 12" years old, Turner forced her to have vaginal intercourse with him. This was the first time he penetrated her completely and ejaculated inside of her. Afterwards, Turner told Victim 1 to put her underwear back on and go take a shower, which she did. There was blood in Victim 1's underwear. She put the underwear in a bag and kept it in a dresser drawer.

On one occasion at the Stayton house, Turner had Victim 2 perform oral sex on Victim 1 while Victim 1 performed oral sex on him. Afterwards, he raped Victim 2.

Victim 2 and Victim 3 became friends at school. Victim 3 was two years younger than Victim 2. Victim 3 had a "tough situation" at home and often stayed at Victim 2's home. When Victim 3 was "12, 13 years old," she was sexually abused by Turner in the Stayton house shed, and witnessed Victim 2 being sexually abused in the shed. Turner had

---

[1] While living on Concord Circle, Mother gave birth to a son to which Turner was the father.

3

Victim 3 touch his penis and perform oral sex on him, and he performed oral sex on Victim 3, touched her breast, and touched her vagina.

"At some point," Victim 1 began "rebelling against [what] was going on," and things between her and Turner "start[ed] getting violent." One time, when Victim 1 was 16 years old, Turner strangled her in the shed. This incident was the basis for the charge in Count 13, in which the State alleged that Turner forcibly raped Victim 1 while he was strangling her.

When Victim 1 was 17 years old and a senior in high school, the family moved to Lamar, Missouri, which is in Barton County. After Victim 1 graduated high school, she visited a friend ("Friend") in Oklahoma and disclosed to Friend that Turner had abused her. Victim 1 told Friend that she had saved a pair of underwear that had Turner's semen and Victim 1's DNA on it, and that the underwear was in a storage shed in Lamar. Victim 1 retrieved the underwear.

Victim 1 had a boyfriend ("Boyfriend"). Victim disclosed the abuse to Boyfriend and his mother, who was a social worker. Victim 1 also disclosed the abuse to her maternal grandparents ("Grandparents"). With Boyfriend's mother's encouragement, Victim 1 reported the abuse to the Lamar Police Department in July 2007. The Kansas City Police Department ("KCPD") and the Independence Police Department ("IPD") also opened investigations, as the majority of the abuse had occurred in Jackson County.

In December 2007, Boyfriend's mother mailed the underwear Victim 1 had saved to KCPD. The underwear was forwarded to the KCPD Crime Laboratory for testing. As

part of the routine testing process, the underwear was cut into pieces for further analysis. Turner's and Victim 1's DNA were found on the underwear cuttings.

On March 3, 2008, the KCPD sergeant who was the lead investigator on the case ("KCPD Sergeant") interviewed Victim 1. During that interview, Victim 1 described scars and marks that she had seen on Turner's penis while performing oral sex, and drew a picture of one of the scars.

KCPD Sergeant interviewed Grandparents on March 25, 2008 and re-interviewed Grandmother on April 18, 2008. Grandmother stated that Victim 1 had told her Turner had sexually abused Victim 1 and Victim 2, and provided details of the abuse.

In 2008, a sergeant with the IPD ("IPD Sergeant") interviewed three individuals who were neighbors of the family when they lived in the Stayton house. The neighbors did not provide any information incriminating Turner. One neighbor said "overall it appeared to be a normal family setting."

During the course of the investigation, Victim 1 told authorities that Turner also sexually abused Victim 2 and Victim 3. A forensic interview of Victim 2 was conducted in 2007. In her forensic interview, Victim 2 denied being sexually abused by Turner.[2] IPD

---

[2] Victim 2 testified at trial that she did not tell anyone about the abuse because she had been conditioned her entire life to accept it and Turner had threatened her. She stated that she had been prepared by Turner on how to deny the abuse if anyone questioned her about it. She also stated that she was fifteen years old when Victim 1 disclosed the abuse to law enforcement, she was still living with Turner, and she was scared.

Sergeant interviewed Victim 3 in May 2008. Victim 3 also denied being sexually abused by Turner.[3]

After learning Victim 2 and Victim 3 had denied the abuse, Victim 1 decided not to move forward with the prosecution. The investigation was closed in 2009 at Victim 1's request. Victim 1 was "19 to 20" years old at that time. The case was "exceptionally cleared," meaning that KCPD had an identified suspect and a victim that did not wish to prosecute him.

On September 9, 2011, KCPD Sergeant completed a KCPD Property Disposition Form, which authorized KCPD's Evidence Room to destroy evidence collected during the investigation of Victim 1's allegations. The form listed the reason for the authorization as "Adult victim declined to prosecute." As a result, items of evidence collected by KCPD in the course of its investigation were destroyed.[4]

In 2017, the Lamar Police Department contacted KCPD Sergeant and informed her that Victim 2 had disclosed sexual abuse by Turner. Victim 2 had decided to come forward after learning that Turner's granddaughter—Victim 1 and Victim 2's niece—had also been sexually abused by Turner.[5] KCPD's case was reopened at that time. Victim 3 was re-

---

[3] Victim 3 testified at trial that she had denied the abuse because she was afraid and had made a pact with Victim 2 not to say anything.

[4] Even though original items of evidence were destroyed, "[a]nything that had been put into digital media was still available," including police reports. Also "[a]nything that had been a paper copy of a document [was] scanned in, so it was also available." The crime lab retains its own reports, so those were available as well.

[5] Turner was charged in 2017 in Vernon County, Missouri, with one count of first-degree child molestation relating to his granddaughter.

interviewed and also disclosed that she was sexually abused by Turner. Victim 1 agreed to cooperate with the prosecution.

The State filed this action against Turner in 2017. Counts 1-14 of the re-amended information in lieu of indictment concerned Victim 1 (six counts of sodomy, five counts of statutory rape, two counts of forcible rape, and one count of child molestation), Counts 15-28 concerned Victim 2 (nine counts of sodomy, four counts of statutory rape, and one count of use of a child in a sexual performance), and counts 29-33 concerned Victim 3 (three counts of child molestation and two counts of sodomy).

Turner moved to dismiss the charges against him or for sanctions against the State, asserting the State failed to preserve and destroyed "exculpatory or at least impeaching" evidence in violation of his due process rights. The trial court conducted a hearing, at which KCPD Sergeant and IPD Sergeant testified.

KCPD Sergeant testified that although part of Victim 1's underwear was destroyed in 2011, the crime lab had retained the cuttings of the underwear that were tested and they were available for further testing. She also testified that the audio recording of Victim 1's 2008 interview and the original drawing of Turner's scar that Victim 1 had made during the interview were disposed of in 2011, however the interview had been transcribed and a photocopy of the drawing had been retained. The transcript and photocopy had been provided to Turner in 2017 when the case was reopened.

KCPD Sergeant stated that the audio recording of the March 2008 interview of Grandmother was unavailable. She testified that there was a "technical difficulty" with Grandmother's interview preventing it from being successfully recorded, so KCPD

7

Sergeant re-interviewed Grandmother in April 2008 with a stenographer present. The April 2008 interview of Grandmother was transcribed by the stenographer and the transcript was provided to Turner. The audio recording of Grandfather's March 2008 interview was also unavailable, as the audio tape was destroyed in 2011 when KCPD Sergeant authorized the destruction of evidence. However, the interview had been transcribed and the transcript was produced to Turner.

IPD Sergeant testified that his 2008 interview of Victim 3 had been audio recorded but that recording was no longer available. He had downloaded the recording into the IPD computer system, but IPD later transferred everything to a new drive, and the recording "apparently didn't make the transfer."[6] Although the audio recording was not available, there was "a transcript made of all of the questions and the answers that were asked during the interview," and that transcript was provided to Turner.

IPD Sergeant also testified that during his investigation he interviewed three former neighbors of the family, and those interviews were audio recorded utilizing "handheld micro recorders." He stated that due to an equipment malfunction, those recordings were lost while being transferred from the recorder to the computer for storage. IPD Sergeant testified that he documented accurate summaries of the interviews in his investigation reports, and those reports were provided to Turner.

The trial court denied Turner's motion to dismiss or for sanctions and the matter proceeded to trial. KCPD Sergeant testified at trial that the original recording of Victim 2's

---

[6] At the time IPD transferred the recording, IPD Sergeant had retired and "left the department," although he was still "an active reserve officer."

8

2007 forensic interview was destroyed in 2011. When the investigation was re-opened in 2017, KCPD Sergeant "reached out" to the Lamar Police Department "to see if they still had any evidence" or if anything had been kept digitally. She was able to obtain a "disk" of Victim 2's recorded forensic interview. A copy of the recorded interview was provided to Turner prior to trial, as well as a transcript of the interview.

At the conclusion of the trial, the jury found Turner guilty of all offenses charged.[7] The trial court sentenced him to life imprisonment plus 107 years.

Turner asserts six points on appeal. In his first three points, he asserts the trial court abused its discretion by refusing to dismiss the charges against him or sanction the State for failing to preserve exculpatory and impeaching evidence, including "a taped denial of the allegations" by Victim 3 (Point I), the original recorded forensic interview of Victim 2 (Point II), and various other pieces of evidence (Point III). In his fourth point, he asserts the trial court abused its discretion by "restricting defense counsel from fully making his argument in closing" relating to the loss of Victim 3's recorded prior denial. In his fifth point, Turner challenges the sufficiency of the evidence to support Count 13 (forcible rape of Victim 1), asserting the State failed to prove sexual intercourse occurred. Finally, in his sixth point, he challenges the sufficiency of the evidence to support Count 28 (use of a child in a sexual performance), asserting the State failed to prove Victim 2 "suffered 'serious emotional injury' so as to enhance from a class C felony to a class B felony."

---

[7] The State dismissed two of the counts after the jury returned its guilty verdicts but prior to sentencing.

9

**Points I, II, and III – Loss or Destruction of Evidence**

In his first three points, Turner claims his due process rights were violated when the State destroyed and failed to preserve exculpatory and impeaching evidence. He asserts the trial court abused its discretion by refusing to dismiss the charges against him or sanction the State for these due process violations.

*Standard of Review and Governing Law*

We review a trial court's ruling on a motion to dismiss a charging instrument for an abuse of discretion. *State v. Berwald*, 186 S.W.3d 349, 366 (Mo. App. W.D. 2005). Similarly, we review a trial court's denial of a requested sanction for abuse of discretion. *See State v. Taylor*, 298 S.W.3d 482, 502 (Mo. banc 2009).

Turner's due process claims raised in Points I, II, and III implicate "'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *State v. Cox*, 328 S.W.3d 358, 362 (Mo. App. W.D. 2010) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 55 (1988)). "The standards governing such claims depend[] on the nature of the evidence the State has destroyed." *Id.*

When the State destroys or fails to preserve "material exculpatory evidence," a due process violation occurs regardless of the good or bad faith of the prosecution. *Id.* (quoting *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004)). "For evidence to qualify as 'materially exculpatory,' 'the evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)).

10

"If the evidence fails to meet this two-pronged test, then the evidence is, at most, only 'potentially useful,' and a showing of bad faith is necessary to substantiate a due process claim based on the State's destruction of the evidence." *Id.*; *see also Fisher*, 540 U.S. at 547-48 (where the State fails "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," such failure "does not violate due process 'unless a criminal defendant can show bad faith on the part of the police.'" (emphasis omitted) (quoting *Youngblood*, 488 U.S. at 57-58)). "In this context, bad faith is the destruction of evidence by a state actor 'for the purpose of depriving the defendant of exculpatory evidence.'" *Berwald*, 186 S.W.3d at 366-67 (quoting *State v. Armentrout*, 8 S.W.3d 99, 110 (Mo. banc 1999)).

"As the proponent of the motion to dismiss, Defendant ha[s] the burden to show the destroyed evidence was materially exculpatory or potentially useful and, if merely potentially useful, destroyed in bad faith." *State v. Erby*, 497 S.W.3d 291, 296 (Mo. App. S.D. 2016).

*Point I – Victim 3's Interview*

In his first point Turner asserts "the State lost and failed to preserve material exculpatory evidence including [Victim 3's] videotaped[8] denial of the allegations, which constituted substantive evidence of innocence and impeaching evidence, and [Turner] could not obtain comparable evidence." Therefore, Turner asserts, the trial court abused its

---

[8] The interview was audio recorded, not videotaped.

11

discretion in refusing to dismiss "the charging document or Counts 29-33 with prejudice, or to sanction the State by precluding [Victim 3's] testimony." We disagree.

Although Victim 3 denied being abused by Turner in her 2008 interview, and the recording of the interview was not preserved, that recording was not "material exculpatory evidence" because Turner was able "to obtain comparable evidence by other reasonably available means." *See Cox*, 328 S.W.3d at 362. The State provided Turner with a verbatim transcript of the 2008 interview, defense counsel interviewed Victim 3 prior to trial, and Victim 3 testified at trial and was cross-examined about the interview, all of which was comparable evidence to the audio recording of the interview. *See State v. Ise*, 460 S.W.3d 448, 458 (Mo. App. W.D. 2015) (the State's destruction of the recording of a 911 call did not violate the defendant's due process rights: the individual who made the 911 call was deposed prior to trial and the defendant had the opportunity to cross-examine the individual at the deposition, thus the deposition testimony about the incident "represent[ed] comparable evidence that was available to [the defendant] at the time of his trial"); *State v. Conway*, 740 S.W.2d 320, 324-25 (Mo. App. E.D. 1987) (the State's failure to preserve 911 tapes did not result in a due process violation where the "defendant had other means available" to obtain comparable evidence, "the most significant of which was cross-examination" of the officer); *State v. Little*, 674 S.W.2d 541, 543 (Mo. banc 1984) (although tapes of interviews were destroyed, evidence of what occurred during the interviews could have been established by testimony of interviewees); *see also United States v. Gaither*, 65 F. App'x 514, 517 (6th Cir. 2003) (an audiotape recording of a drug transaction was not material exculpatory evidence because the defendant was able to obtain

12

comparable evidence by other means: the defendant "testified at trial and presented to the jury his contention that the missing audiotape contained exculpatory evidence" and "[t]he same contention was presented to the jury through [the defendant's] cross-examination of the government's witnesses"); *Buie v. Sullivan*, 923 F.2d 10, 12 (2d Cir. 1990) (police officer's trial testimony about exculpatory statements made by the defendant's alleged accomplice in an interview was comparable evidence to the accomplice testifying at trial).

Turner argues "[n]o evidence was comparable to [Victim 3's] own voice insisting Turner never abused her," and "the audiotaped denial would have allowed the jury to gauge her credibility and demeanor in assessing which was true—her initial denial or her trial testimony." However, the cases cited above do not support Turner's contention that there was no comparable evidence to the recording of Victim 3's interview. Rather, Missouri and federal courts have held that where a recording is lost or destroyed, trial testimony about the recording may be comparable evidence. Moreover, the jury was able to assess Victim 3's credibility and demeanor while she testified at trial about the 2008 interview. Thus, we disagree with Turner's contention that there was no evidence comparable to the audio recording of Victim 3's interview.

Because the audio recording of Victim 3's statement was not "material exculpatory evidence," it was "at most, only 'potentially useful,' and [thus] a showing of bad faith [was] necessary to substantiate" Turner's due process claim. *See Cox*, 328 S.W.3d at 362. But Turner failed to demonstrate the State acted in bad faith in failing to preserve this evidence. IPD Sergeant testified that he downloaded the recording into the IPD computer system, but sometime after he retired, IPD transferred everything to a new drive and the recording was

13

lost during the transfer. He stated that he had "long conversations with [the] IT department" trying to locate the recording, but "it's just gone." Thus, the only evidence on this issue was that the recording was lost due to oversight or an equipment or computer malfunction, and although IPD attempted to locate the recording, it was unable to do so. There was no indication that law enforcement destroyed the evidence "for the purpose of depriving [Turner] of exculpatory evidence," as required to substantiate a due process violation for loss of potentially useful evidence. *See Berwald*, 186 S.W.3d at 366-67.

For these reasons, we find the trial court did not abuse its discretion in refusing to dismiss the charges against Turner or sanction the State based on the loss of Victim 3's recorded interview, as Turner failed to establish his due process rights were violated. Point I is denied.

*Point II – Victim 2's Interview*

In his second point, Turner asserts his constitutional rights were violated when the State destroyed "the original recorded interview" of Victim 2 "and never provided a working copy, and no comparable evidence existed." As a result, he asserts, the trial court abused its discretion by denying his "pretrial motions to compel and dismiss the charging document or Counts 15-28 with prejudice, or for sanctions, including the exclusion of [Victim 2's] testimony." We disagree.

Contrary to Turner's claim, the State did not deprive Turner of "material exculpatory evidence." Although the original recording of Victim 2's interview was destroyed in 2011, KCPD Sergeant obtained a copy of the interview from the Lamar Police Department when the investigation was re-opened in 2017. A copy of the recorded

14

interview and a transcript of the interview were provided to Turner prior to trial. These items constituted comparable evidence to the original recording. As previously explained, evidence is not materially exculpatory if a defendant is able to obtain comparable evidence by other reasonably available means. *See Cox*, 328 S.W.3d at 362.

Although Turner argues on appeal that he was left without comparable evidence because the State provided Turner a defective copy of the recording, we find that he waived this argument. Turner did not raise this discovery issue prior to trial even though he had the opportunity to do so: the State produced a copy of the recorded interview to Turner in November 2017, and the trial commenced in July 2021. Instead, Turner waited until his motion for new trial to assert that the State "never disclosed the entire" forensic interview, and that the recording "played for a mere three minutes and eighteen seconds (3:18) before the video froze and the accompanying audio disappeared."[9] Turner waived any constitutional argument relating to the defective disk by failing to raise the issue at the earliest opportunity. *See State v. Koenig*, 115 S.W.3d 408, 414-15 (Mo. App. S.D. 2003) (the defendant waived any claim of constitutional violation relating to the failure to disclose records where the first allegation of a due process violation relating to the failure to disclose those records was raised in his motion for new trial).

Moreover, the claim of error Turner has raised in this point on appeal is that the trial court abused its discretion in denying Turner's "pretrial motions to compel and

---

[9] The State responded that "Defense counsel failed to inform either the Court or counsel for the State . . . that the disc containing the CAC interview would not play in its entirety," and had "counsel for the State been so informed a new disc would have been made available immediately."

15

dismiss." Yet nowhere in his pretrial motions did Turner claim he received a defective copy of the recording. In other words, the basis for the due process claim raised in this point on appeal—that the disk was defective and thus there was no comparable evidence to the original recording of Victim 2's forensic interview—was not presented to the trial court in his pretrial motions. The issue was only raised in his motion for new trial, and he has not asserted in this point that the trial court abused its discretion in denying that motion.

Accordingly, we find the trial court did not abuse its discretion in denying Turner's pretrial motions to dismiss or compel based on the State's failure to preserve Victim 2's original forensic interview. Point II is denied.

*Point III – Various Items of Evidence*

In his third point, Turner claims the State "destroyed and failed to preserve original items of evidence from the initial investigation," such items were "irreplaceable exculpatory and impeaching evidence, as well as potentially exculpatory evidence," and the "cumulative effect of all lost original evidence violated due process and was of such significance that the outcome of the trial would be affected." Thus he asserts the trial court abused its discretion in denying his "motions to dismiss or for sanctions and [his] motion for new trial." The specific items of evidence at issue in this point are:

- The recording of Victim 1's March 3, 2008 interview and the drawing Victim 1 made during the interview

- Victim 1's underwear mailed to law enforcement

- The recording of Grandparents' March 25, 2008 interviews

16

- The recordings of the neighbors' 2008 interviews[10]

We find, for numerous reasons, that the trial court did not abuse its discretion in refusing to dismiss the charges or sanction the State based on the loss or destruction of these items of evidence.

First, most of these items were not exculpatory, let alone materially exculpatory or potentially useful. Turner's DNA was found on Victim 1's underwear. In Victim 1's March 3, 2008 interview, she detailed the abuse inflicted upon her by Turner and described scars and marks that she had seen on his penis while performing oral sex. During that interview she drew a picture of one of the scars. Grandmother's March 2008 interview was not successfully recorded, so Grandmother was re-interviewed. In her "re-interview" she stated that Victim 1 had disclosed the abuse to her and provided details of the abuse.

We are not persuaded by Turner's attempts to frame these items of evidence as exculpatory or potentially useful. He asserts that it was "important" for him to "examine"

---

[10] Turner cites two additional pieces of evidence: a recording of an October 2, 2007 interview with Victim 1 and Victim 2's brother ("Brother") and a "recording of Friend April 25, 2008 interview." However, Turner never sought sanctions or dismissal of the charges against him based on the loss or destruction of these items of evidence. In Turner's motion to dismiss, he alleged the State failed to preserve a "[t]welve-page type written letter" from Brother—not a recorded interview—and an "[a]udio recording of law enforcement interview via phone conference with" Friend, citing "Bates pp. 36." Relating to the audio recording of Friend's interview, the State responded that a "September 13, 2017 phone call with" Friend was not recorded, and the KCPD Police Report Supplement "produced at Bates-stamped page 36, states the purpose of the call was simply to inform [Friend] the case had been re-opened." Turner later filed his second motion to compel, in which he also sought dismissal of the charges against him based on lost or destroyed evidence. Neither an October 2, 2007 interview with Brother nor an April 25, 2008 interview with Friend was referenced in that motion. Because Turner never sought sanctions or dismissal of the charges against him based on the State's failure to preserve these items of evidence, we do not consider them on appeal.

17

Grandparents' March 2008 interviews for any "inconsistencies or inaccuracies," "it was necessary for the defense to inspect the original" drawing, and Turner lost the ability to have the destroyed portion of the underwear "examined for DNA, which may have shed light on the findings presented by the State at trial."[11] But Turner's arguments rest on mere speculation, and speculation does not establish that the lost evidence was exculpatory or potentially useful. *See Berwald*, 186 S.W.3d at 367 (the defendant failed to show that the tape in question contained exculpatory evidence where "he articulate[d] no specific basis for doing anything more than speculating that something exculpatory might possibly have been found had the tape been electronically enhanced to filter out the static and background noise"); *State v. Burns*, 112 S.W.3d 451, 455 (Mo. App. W.D. 2003) (the defendant "made no showing that any destroyed evidence was actually or even likely to be helpful to his defense" where he did no more than "speculat[e] that something exculpatory might possibly be found").

Second, evidence comparable to the lost evidence was available. Turner received a transcript of Victim 1's interview and a photocopy of the drawing, the underwear cuttings were retained by the KCPD crime lab, Grandfather's March 2008 interview was transcribed and Turner received a copy, Grandmother's April 2008 "re-interview" was transcribed and Turner received a copy, and IPD Sergeant summarized the neighbors' interviews and Turner was given those summaries.

---

[11] Although the underwear was partially destroyed, the underwear cuttings were retained by the KCPD crime lab. Turner has never requested to test the cuttings.

18

Third, Turner did not establish the State acted in bad faith in destroying or failing to preserve this evidence, as required to show his due process rights were violated by the deprivation of potentially useful evidence. The recordings of Grandmother's March 2008 interview and the neighbors' 2008 interviews were lost due to equipment malfunctions. When KCPD Sergeant realized Grandmother's interview had not been successfully recorded, she "re-interviewed" Grandmother with a stenographer present. Further, KCPD Sergeant authorized the destruction of evidence in 2011 because the case was "exceptionally cleared" two years earlier, when Victim 1 informed her that she did want to pursue prosecution. *See Erby*, 497 S.W.3d at 296 (no bad faith where "evidence was destroyed for the innocent reason that prosecution of Defendant initially was declined"). Finally, KCPD Sergeant reached out to other law enforcement agencies when the case was re-opened in an attempt to obtain copies of evidence that had been destroyed. Based on the above, the trial court could have reasonably concluded that any loss or destruction of evidence in this case was not done to deprive Turner of exculpatory evidence, and thus was not done in bad faith.

Turner, nonetheless, argues bad faith was present and the State's actions were "egregious" because KCPD's disposal of the evidence violated its own policies. We disagree. KCPD Sergeant testified about two KCPD manuals that govern disposal of evidence: the Crimes Against Children Section Duty Manual and the Sex Crimes Duty Manual. In cases involving child victims, disposal dispositions are made "on a case by case basis," and evidence "should be held if the case is inactivated and there is a chance the child could disclose in the future or if there is a viable criminal case with evidence that

19

could be completed with follow up investigation." Pursuant to the Sex Crimes Duty Manual, if an adult sex crime case has been closed with a known suspect and a victim that does not wish to prosecute, the property can be disposed. KCPD Sergeant stated that Victim 1 was an adult when she informed KCPD Sergeant that she did not want to pursue prosecution, and that when the evidence was disposed, Victim 2 and Victim 3 were not child victims because they "had denied any abuse at that time." KCPD Sergeant stated that she considered both manuals when making the decision to authorize disposal of the property: "It was a collaboration of both. In the Crimes Against Children Manual it also says that each case will be looked at on a case-by-case basis. And because of the circumstances of [Victim 1's] individual case, we felt that this was the appropriate way to handle the property." The trial court could have reasonably concluded from this evidence that KCPD Sergeant carefully considered the governing policies, and her actions did not support a finding of bad faith.

For these reasons, we find the trial court did not abuse its discretion in denying Turner's motions to dismiss or for sanctions, or his motion for new trial. Point III is denied.

**Point IV – Closing Argument**

In his fourth point, Turner claims the trial court abused its discretion in restricting his closing argument. He contends that he "was entitled to argue in closing that because the State lost the recording of [Victim 3's] prior denial, he could not show her demeanor and tone during the interview, which may have shown that her prior denial was equally or more credible than her trial testimony." He contends that had he been able to "fully" make

this argument, there is a reasonable probability the verdicts would have been different. We disagree.

> Defense counsel argued the following during closing:
>
> One of the issues that the State mentioned a lot throughout this trial was demeanor.
>
> Demeanor of witnesses. Demeanor of my client during the search warrant. And I guess, nonverbal and tone of witnesses' voices and their statements. I'm going to tell you about some demeanor evidence that we don't have. You heard [IPD Sergeant] testify that [Victim 3's] interview the initial one where she not only did not corroborate the allegation she flatly denied them. She made sure to say that at some point I believe it was I know that if I - - excuse me - - I've been abused, so I would think I would know if I've been abused in this instance. And she vehemently denied any abuse took place. We didn't get to hear that interview.

At this point, the State objected to facts not in evidence and to any false implication that the loss of the recording resulted in the jury having evidence withheld from it that it would have otherwise been entitled to review; the trial court sustained the State's objections.[12]

We find Turner did not suffer prejudice from the trial court's ruling sustaining the State's objections. Turner essentially made the arguments during closing that he claims he was prevented from making. He argued that the jury "didn't get to hear" Victim 3's initial interview in which she "vehemently denied any abuse took place," and that this was "demeanor evidence that" the jury did not have. He also later argued that when the jury was not provided with recorded interviews, the jurors were deprived of "seeing" the "initial demeanor, initial tone of witnesses who made the statements" and thus did not have "the

---

[12] The bench conference where this occurred was not recorded in the trial transcript, but the parties have stipulated as to what transpired during the conference and the stipulation was filed with this Court.

luxury" of listening to the interviews and determining "for [themselves] if those interviews are credible." Although this final argument was made relating to the unavailable audio recordings of the neighbors' interviews, the general premise was applicable to Turner's argument relating to Victim 3's recorded interview, and the fact that the jury was not able to hear the recording.

In light of the closing argument made by defense counsel, we find no reasonable probability that the verdicts would have been different had defense counsel been able to more "fully" argue that the lost recording of Victim 3's prior denial "may have shown that her prior denial was equally or more credible than the trial testimony." In other words, Turner failed to demonstrate he suffered prejudice from the trial court's ruling. *See State v. Brown*, 577 S.W.3d 870, 878 (Mo. App. W.D. 2019) ("To establish prejudice [from the trial court's ruling on the scope of closing argument], the defendant must show that there is a reasonable probability that, in the absence of the trial court's abuse [of discretion], the verdict would have been different."). Without establishing prejudice, his claim of reversible error fails. *See State v. Smith*, 422 S.W.3d 411, 415 (Mo. App. W.D. 2013) ("Even if a trial court is found to have abused its discretion by allowing improper closing argument, to warrant reversal of a conviction, the defendant must also establish that such abuse prejudiced him or her.").

Point IV is denied.

### Point V – Sufficiency of Evidence - Count 13 (Forcible Rape)

In his fifth point, Turner asserts there was insufficient evidence to support his conviction for forcible rape of Victim 1 (Count 13), in that the State failed to prove "that

sexual intercourse occurred at the time that [Turner] was alleged to have committed forcible rape." We find, however, that there was sufficient evidence sexual intercourse occurred.

The State charged in Count 13 that "on or between August 26, 2005 and May 27, 2007" Turner "knowingly had sexual intercourse with [Victim 1] by the use of forcible compulsion, to wit: strangling [Victim 1] at Stayton." "Sexual intercourse" is defined as "any penetration, however slight, of the female sex organ by the male sex organ, whether or not an emission results." § 566.010(4), RSMo 2000. "Proof of penetration may be shown by direct or circumstantial evidence[.]" *State v. Barbee*, 568 S.W.3d 28, 31 (Mo. App. W.D. 2018).

When a defendant challenges the sufficiency of the evidence to support a conviction, we review "whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Primm*, 347 S.W.3d 66, 72 (Mo. banc 2011). We view the evidence "in the light most favorable to the verdict, considering all favorable inferences and disregarding all contrary inferences." *Id.* The evidence relating to Count 13 was as follows.

Turner impregnated Victim 1 and she had an abortion when she was 16 years old. Victim 1 did not "return to school right away" after her abortion. Victim 1 agreed to be "on a sex schedule of some sort while [she] was home," with the agreement that Victim 2 "was not going to be raped anymore because [Victim 1] was on birth control, [and Victim 2] was not." "[T]wice a day, almost every day [Victim 1] would go out [to the shed] and either

23

have sex or give oral to [Turner] in exchange for [her] sister not having any obligations or him not touching [her] sister."

Victim 1 testified that "[a]t some point," she started to rebel against what was "going on" and things between her and Turner started to get violent. Victim 1 testified about "an incident where strangulation was involved" when she was 16 years old:

> He would get angry, raged, jealous when he would hear or see that maybe I was making out with my boyfriend in the driveway or something. No matter where I went it seemed. I'm sure there was a camera. So I would refuse sometimes to go to the shed and just not care.
>
> I was making my own money at Sonic so I could buy my own necessities. And there really wasn't a lot of hold that I think he felt that he had anymore, but he would still manage to get me to come out into the shed. So I went out there just to talk is what he said and when I went out he called me every name I think that he knows to call somebody - - usually directed around whore things like that. And I stood up to go away and try to leave or try to get out and he would choke me until I passed out. And then when I would wake back up he would get back in my face to threaten and yell at me and just be belligerently drunk and do it again.

After this incident Victim 1 noticed a bruise on her collarbone. She testified that she told her mother "about that while it was still on [her] throat the next day when [she] noticed that it was there." The prosecutor then asked, "What did you tell your mother?"

A. I said [Turner] choked me.

Q. How did she respond?

A. She wanted to know what I did.

Q. Did you tell her he told you why he was raping you?

A. No. I just said that he took me and it was the most blunt I had been about any kind of abuse that I was going through with her so far.

24

Although Victim 1 did not use the term "sexual intercourse" in describing the incident when Turner strangled her in the shed, a reasonable juror could have concluded they engaged in sexual intercourse. When Victim 1 told her mother about the incident, Victim 1 said that Turner "took" her, which was "the most blunt [she] had been about any kind of abuse" so far. Additionally, she told her mother Turner "took" her in response to the prosecution's question, "Did you tell [Mother] he told you why he was raping you?" Victim 1 also testified that when she woke up after passing out Turner would "do it again." When Victim 1 used the terms "do it" and "took" her to describe what occurred in the shed, it was reasonable to infer that she was referring to sexual intercourse. *See Primm*, 347 S.W.3d at 72-73 (noting "[t]here is no magic word necessary to describe penetration," and finding that the term "doing it" is commonly used slang for sexual intercourse); *see also* Merriam-Webster Online Dictionary, https//www.merriam-webster.com/dictionary/take and https//www.merriam-webster.com/dictionary/copulate (last visited December 15, 2023) (one definition of "take" is "to copulate with," and "copulate" is defined as "to engage in sexual intercourse"). This is especially true given the evidence that during this time period Turner had regular sexual intercourse with Victim 1 in the shed as part of a "sex schedule." Accordingly, we find there was sufficient evidence to prove that Turner had sexual intercourse with Victim 1 as charged in Count 13.

Point V is denied.

25

## Point VI – Sufficiency of Evidence - Count 28 (Use of Child in a Sexual Performance)

In his sixth point, Turner claims there was insufficient evidence to support his conviction of the class B felony of use of a child (Victim 2) in a sexual performance (Count 28). He asserts that the State was required to prove Victim 2 suffered "serious emotional injury" to enhance from a class C felony to a class B felony, section 556.061(27) requires expert testimony to establish "serious emotional injury," and the State did not admit expert testimony on this issue at trial. We agree that the evidence was insufficient to enhance this offense from a class C felony to a class B felony.

The offense of using a child in a sexual performance is a class C felony "unless in the course thereof the person inflicts serious emotional injury on the child, in which case the crime is a class B felony." § 568.080.2, RSMo 2000. "Serious emotional injury shall be established by testimony of qualified experts upon the reasonable expectation of probable harm to a reasonable degree of medical or psychological certainty[.]" § 556.061(27), RSMo 2000.

The State concedes that no expert testified at trial to establish Victim 2 suffered "serious emotional injury" as required to enhance Turner's felony. Both Turner and the State urge this Court to reverse Turner's conviction for the class B felony, enter a conviction for the lesser-included class C felony, and remand to the trial court for resentencing. *See State v. O'Brien*, 857 S.W.2d 212, 220 (Mo. banc 1993) ("Where a conviction of a greater offense has been overturned for insufficiency of the evidence, the reviewing court may enter a conviction for a lesser offense if the evidence was sufficient

for the jury to find each of the elements and the jury was required to find those elements to enter the ill-fated conviction on the greater offense."); *State v. Collins*, 150 S.W.3d 340, 357 (Mo. App. S.D. 2004) (the class C felony of use of a child in a sexual performance is a lesser included offense of the class B felony). Turner has not challenged any other elements of this offense. The evidence was sufficient for the jury to find each element of the class C felony and the jury was required to find those elements to convict Turner of the class B felony.

Point VI is granted. We reverse Turner's conviction for the class B felony of use of a child in a sexual performance, enter a conviction for the class C felony of use of a child in a sexual performance, and remand to the trial court for resentencing on this conviction.

### Conclusion

We reverse Turner's conviction for the class B felony of use of a child in a sexual performance, enter a conviction for the class C felony of use of a child in a sexual performance, and remand to the trial court for resentencing on this conviction. In all other respects, the judgment is affirmed.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.